UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
GAIL BENZMAN, DIANE LAPSON, JIM and
ANAMAE GILROY, JoALISON POLETT,
ROBERT GULACK, JANICE FRIED, JOHN
CALDER, JENNA ORKIN, KELLY COLANGELO,
GEORGE DINOS, BRIAN EDWARDS, and
SARA MANZANO-DIAZ, on their behalf
and on behalf of all other persons
similarly situated,

                Plaintiffs,          04 Civ. 1888 (DAB)
                                         OPINION
      -against-

CHRISTINE TODD WHITMAN, MARIANNE
L. HORINKO, MICHAEL LEAVITT, and the
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

                Defendants.
-------------------------------------X
DEBORAH A. BATTS, United States District Judge.

      Before the Court are two separate Motions to Dismiss filed

by Christine Todd Whitman and Marianne Horinko ("Individual

Defendants"), and Michael Leavitt and the United States

Environmental Protection Agency ("EPA Defendants").

      Plaintiffs Gail Benzman, Diane Lapson, Jim and Anamae

Gilroy, JoAlison Polett, Robert Gulack, Janice Fried, John

Calder, Jenna Orkin, Kelly Colangelo, George Dinos, Brian Edwards

and Sara Manzano-Diaz have brought the above-captioned putative

class action suit on behalf of a class consisting of: (a)

residents of Lower Manhattan (which includes Chinatown and the

Lower East Side) and Brooklyn; (b) students attending schools in

Lower Manhattan and Brooklyn; (c) workers whose place of employment was in Lower Manhattan and Brooklyn; who have been exposed to hazardous substances in the interior of their residences, schools and workplaces as a result of the dust and debris released from the collapse of the World Trade Center ("WTC") towers and surrounding buildings following the terrorist attacks on September 11, 2001. (Am. Compl. ¶ 1.) Plaintiffs bring this action against Defendants Christine Todd Whitman ("Whitman"), Administrator of the EPA as of September 11, 2001, and until June 24, 2003; Marianne Horinko ("Horinko"), Assistant Administrator designee of the EPA during that same period of time; Michael Leavitt ("Leavitt"), the current Administrator of the EPA; and the United States Environmental Protection Agency ("EPA"). (Id.)

Plaintiffs bring four causes of action in their Amended Complaint. Count One, alleging a violation of the Fifth Amendment of the Constitution, is asserted against Individual Defendants Whitman and Horinko. Plaintiffs seek compensatory damages, reimbursement of costs incurred by Plaintiffs, and the creation of a fund to finance medical monitoring services. Counts Two and Three are asserted against the EPA Defendants. Count Two challenges EPA Defendants' actions after the September 11, 2001 attacks under the Administrative Procedure Act ("APA"),

5 U.S.C. § 701, et seq., for not being in accordance with the law, as arbitrary and capricious, and contrary to Plaintiffs' Fifth Amendment rights. Count Three is a mandamus action, pursuant to 28 U.S.C. § 1361. Count Four is asserted against only the EPA and is brought pursuant to the citizen suit provision of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9659(a)(1), for violation of regulations under CERCLA. The last three causes of action seek identical relief: to compel testing by the EPA of office buildings, schools and residences in Lower Manhattan and Brooklyn, and if such tests reveal the presence of hazardous substances, to implement a professional clean-up of all such buildings, and to compel the EPA to implement a program for medical monitoring services. (Id. ¶¶ 239, 245, 248.)

The Individual Defendants have moved to dismiss Count One of the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). EPA Defendants have moved to dismiss Counts Two, Three and Four pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

For the reasons that follow, Individual Defendants' Motion to Dismiss is GRANTED in part and DENIED in part, and EPA Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.

# I.  BACKGROUND

The following facts are taken from the Amended Complaint and are assumed to be true for the purposes of the Motions to Dismiss.

This case is based on nihilistic actions that are imprinted on our collective memory as a nation.  On September 11, 2001, terrorists hijacked three commercial airplanes.  Two of these planes were intentionally flown into the World Trade Center towers in New York City.  Within hours of impact, the two towers collapsed, killing thousands and spreading vast amounts of dust and debris.  (Am. Compl. ¶ 41.)  The airborne dust blanketed Lower Manhattan and also settled in building interiors north of Canal Street in Manhattan and parts of Brooklyn.  (Id. ¶ 2.)

## A.___Declaration of a National Disaster

On the day of the attacks, President Bush signed a major disaster declaration for all five New York City counties, in order to provide assistance to New York State.  This declaration activated the Federal Response Plan ("FRP"), which establishes the process and structure for the Federal Government to provide assistance to local agencies when responding to any major disaster or emergency declared under the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42

U.S.C. § 5121, et seq. (Id. ¶ 44.) The Stafford Act was enacted in 1974 and its purpose is "to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which result from such disasters . . . ." 42 U.S.C. § 5121(b).

The FRP, which is administered by the Federal Emergency Management Agency ("FEMA"), includes twelve Emergency Support Functions. Each Emergency Support Function describes the specific type of support it provides to local authorities and identifies the Federal agency responsible for lending and assisting in that support. (Am. Compl. ¶ 45.) Emergency Support Function No. 10, "Hazardous Materials Annex" ("ESF #10"), provides support to State and local governments in responding to an actual or potential discharge and/or release of hazardous materials following a major disaster or emergency, including the release of airborne contaminants. Part of the purpose of ESF #10 is to coordinate the provision of federal support and overall management to the disaster response sites "to ensure actions are taken to mitigate, clean up, and dispose of hazardous materials and minimize the impact of the incidents." (Id. ¶¶ 46-47.) The EPA is the designated lead agency for any activation of ESF #10. (Id. ¶ 46.) FEMA's mission assignment to the EPA, immediately

after the collapse of the World Trade Center (hereinafter referred to as "WTC Collapse"), included responsibilities such as "assessing 'all hazardous substance and oil releases throughout the NY, NY Metropolitan Area resulting from the World Trade Center attack'" as well as sampling, staging, securing and disposing of all hazardous materials and oil releases. (Id. ¶ 46.)

ESF #10 places the response mechanisms of the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP") within the FRP coordination structure. (Id. ¶ 48); see also 40 C.F.R. § 300.3(d) ("the NCP applies to and is in effect when the FRP and some or all of its Emergency Support Functions are activated.") The NCP are regulations enacted pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), a statute enacted in 1980 which provides statutory authority and funding for the clean-up of serious threats to public health and the environment. See 42 U.S.C. § 9601, et seq. The NCP provides guidelines and procedures for responding to releases and threatened releases of hazardous substances, pollutants, or contaminants, including releases that threaten air quality. (Am. Compl. ¶ 49.) The NCP is also the

implementing regulation for the EPA's Superfund program.[1]  (Id.)

The EPA is the agency responsible under the NCP for discharges or

releases of hazardous substances into or threatening an inland

zone.

B.    WTC Collapse and the Presence of Pollutants and Hazardous
      Substances

The collapse of the WTC towers and nearby buildings created

a 16-acre disaster zone.  The initial fire caused by the impact

of the planes, the "pancaking" or downward implosion of the

buildings, and the subsequent fire, released hazardous substances

into the environment, and deposited an estimated one million tons

of dust on Lower Manhattan and surrounding areas.  This dust was

composed of a mixture of building debris and combustion by-

products, which included asbestos, lead, glass fibers and

concrete dust.  Fires at the WTC site emitted harmful pollutants

into the air, including particulate matter, various metals,

polychlorinated biphyenyls (PCBs), volatile organic compounds

(VOCs), polycyclic aromatic hydrocarbons (PAHs) and dioxin.  (Am.

Compl. ¶¶ 42-43.)   According to Plaintiffs, the exact

---

[1]  CERCLA is often referred to as the "Superfund" statute.
"Superfund" is the Federal government's program to clean up
uncontrolled hazardous waste sites.  See http://www.epa.gov/
superfund/index.htm.

composition of the building materials used in the WTC towers is not known, but some of the major hazards were "readily apparent," including:  2000 tons of asbestos used in the construction of the towers; fiberglass and Freon refrigerants used in the air conditioning systems; an estimated 424,000 tons of concrete, sheet, gypsum, fiberglass and glass; approximately 50,000 personal computers each containing approximately 4 pounds of lead; glass; PCBs; mercury from light bulbs and computers; and 130,000 gallons of transformer oil.  (Id. ¶ 52.)  Based on the 1993 terrorist attacks on the World Trade Center, the EPA already knew that the WTC towers contained roughly 400 to 1,000 tons of asbestos.  Moreover, the EPA had general knowledge that the "uncontrolled burning of building materials releases toxic chemicals and that cement dust is very caustic because the EPA has studied incineration, demolition and pollution and debris they create for many years."  (Id. ¶¶ 54-55.)

The EPA began collecting samples of the bulk dust on September 11, 2001 to determine the level of asbestos present. By September 12, 2001, the EPA knew that one of the first samples it had tested contained 4% asbestos, four times higher than the EPA threshold for danger, 1%, which is also the standard the EPA employed as the point at which asbestos in WTC dust becomes a

danger to human health.[2]  One hundred and seventy bulk dust
samples were taken by September 17, 2001 and 30% of those were
found to contain levels of asbestos higher than 1%.  (Id. ¶ 56.)
When conducting these tests, the EPA used a 20-year-old
technology, polarized light microscopy ("PLM"), known to be far
less sensitive in detecting asbestos than the newer transmission
electron microscopy ("TEM") or scanning electron microscopy
("SEM") technologies.[3]  (Id. ¶ 56.)  The EPA did use TEM,

---

[2]  Plaintiffs note in their Amended Complaint that the 1%
standard is "flatly inconsistent with the EPA's historical
position . . . that all asbestos exposure is hazardous to human
health."  (Am. Compl. ¶¶ 56, 130.)

[3]  PLM, TEM and SEM are three different methods for
analyzing asbestos material.  The EPA describes PLM as a method
used to "visually estimate the percent of asbestos in bulk
samples, such as soil and insulation materials.  It can
differentiate between asbestos types, but cannot reliably detect
asbestos in low concentrations (below 1%)."  See Region 8 - Libby
Asbestos, Sampling and Analysis, Analytical Methods at
http://www.epa.gov/region8/ superfund/libby/sampling.html.  TEM
is "more complex than PCM or PLM, and it uses a more
sophisticated analysis instrument.  TEM can distinguish between
asbestos and non-asbestos fibers and asbestos types.  It can be
used at higher magnifications, enabling identification of smaller
asbestos fibers than can be seen by other techniques."  Id.  SEM
is similar to TEM.  "It is capable of distinguishing asbestos
fibers from non-asbestos fibers and is capable of higher
magnifications than PCM.  Its range of visibility is more limited
than TEM."  Id.  PCM (Phase contrast microscopy) is the
traditional technique for measuring asbestos fibers in air and
results of PCM testing are often used to estimate health risk due
to asbestos in air.  However, PCM is of limited utility because
it cannot distinguish between asbestos and non-asbestos fibers.
Id.

9

however, when it tested its own building at 290 Broadway in Lower Manhattan.

Not satisfied with government reports and unable to obtain monitoring data from government agencies, several organizations and independent researchers conducted their own tests.  These tests revealed asbestos at levels of 3% and 4.5%, high levels of fiberglass and the substance used to replace it, and other types of mineral fibers.[4]  Studies also showed that the EPA tests could not detect the finer-particle, more hazardous form of asbestos which was also released into the environment by the WTC Collapse.

An environmental toxicologist for HP Environmental Inc., Hugh Granger, took samples of residual dust from both inside and outside two office buildings near Ground Zero.  Granger used the TEM method because the asbestos fibers found "were considerably smaller than usual."  (Id. ¶ 60.)  The samples revealed that close to 90% of the asbestos fibers were less than 5 microns in length.  According to Granger, the analytical methods used by the EPA could not detect such short fibers.  (Id. ¶¶ 59-60, 76-77.)

Another study was conducted by Dr. Thomas Cahill and the

_____

[4]  Plaintiffs acknowledge that fiberglass is not as dangerous as asbestos, but cite the American Lung Association's caution that "There might be a possibility that [fiberglass] fibers cause permanent damage to the lungs or airways, or increase the likelihood of developing lung cancer."  (Id. ¶ 59.)

Delta Group, a group of scientists convened by the U.S. Department of Energy to monitor major air pollution incidents around the world. Measurements were taken a mile north of Ground Zero, starting weeks after September 11, 2001. Dr. Cahill found a level of fine particulates in the outdoor air that was higher than levels measured at the Kuwaiti oil field fires during the Gulf War. (Id. ¶ 65.) Plaintiffs allege that the existence of such a dangerously high level of fine particulates in the outdoor air, a mile away from Ground Zero, indicates the likelihood that such a level existed in the WTC dust that permeated indoor air. (Id. ¶ 66.)

Private tests also found high levels of polycyclic aromatic hydrocarbins (PAHs), a group of well-known carcinogens, in the WTC dust. The EPA did not test for PAHs or other toxic organic chemicals. (Id. ¶ 68.)

Various other articles and studies by scientists also addressed the hazardous nature of the WTC dust. (Id. ¶¶ 69-74.) One such study, the largest in terms of buildings analyzed, was performed by the New York City Department of Health and Mental Hygiene and the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry. The study collected dust and air samples in and around 30 residential buildings between November 4 through December 11, 2001 in Lower

Manhattan.  The final report was issued in September, 2002.  (Id.
¶ 210.)  According to a report by the EPA's Office of the
Inspector General issued on August 21, 2003 ("OIG Report"), 85%
of the apartments had been cleaned prior to that sampling.
However, the study concluded that almost 20% of the apartments
still had interior dust with asbestos at above 1%.  (Id. ¶ 76.)


C.    The EPA's Actions

      According to Plaintiffs, Defendants EPA, Whitman and Horinko
undertook a series of actions "which consistently exemplif[ied] a
concerted effort on the part of the EPA to avoid responsibility
for the interior clean-up of buildings contaminated by the WTC
Dust despite its legal obligations to do so and despite the
health risk such contaminants have posed to the occupants."  (Id.
¶ 3.)  These actions included statements made by the EPA, Whitman
and Horinko, the failure of Defendants to uphold their
obligations under law, the improper delegation of indoor clean-up
to the City of New York, and the inadequate voluntary clean-up
program implemented belatedly in 2003.


      1.    Statements Made by the EPA and Whitman

      Although tests revealed high levels of asbestos, on
September 17, 2001, Federal and New York City officials allowed

thousands of people to return to their homes and workplaces in Lower Manhattan and Brooklyn, without any proper clean-up of those areas.[5]  (Id. ¶ 2.)  The EPA and Whitman issued a number of press releases which falsely represented that the air in and around Lower Manhattan was safe to breathe, and that there were no significant health risks, although at the time they issued these statements, the EPA and Whitman did not have sufficient data and analyses to substantiate these statements.  (Id. ¶ 4.)

In a September 13, 2001 press release, the EPA assured the public that the air around Ground Zero was relatively safe and stated that "Short-term, low-level exposure of the type that might have been produced by the collapse of the World Trade Center buildings is unlikely to cause significant health effects."  (Id. ¶ 126.)  In the press release, Whitman also stated that the "EPA is greatly relieved to have learned that there appears to be no significant levels of asbestos dust in the air in New York City."  (Id.)

The EPA's Office of Inspector General ("OIG") Report of August 21, 2003 listed the following key statements from EPA

_____

[5]  **Federal officials allowed people to return even though on September 12, 2001, Dr. Ed Kilbourne, a senior scientist at the Toxic Substances and Disease Registry, warned the EPA against reoccupation of buildings in Lower Manhattan because of the dangers posed by the presence of hazardous substances.  (Am. Compl. ¶ 129.)**

press releases, made in the days and months following the

September 11, 2001 attack:

- September 16, 2001: "Our tests show that it is safe for New Yorkers to go back to work in New York's financial district" (quoting Assistant Secretary of Labor for [Occupational Safety and Health Administration]). "The good news continues to be that air samples we have taken have all been at levels that cause us no concern" (quoting Whitman). "The Agency is recommending that businesses in the area planning to reopen next week take precautions including cleaning air conditioning filters and using vacuums with appropriate filters to collect dust."

- September 18, 2001: "We are very encouraged that the results from our monitoring of air quality and drinking water conditions in both New York and near the Pentagon show that the public in these areas is not being exposed to excessive levels of asbestos or other harmful substances. Given the scope of the tragedy last week, I am glad to reassure the people of New York and Washington, DC that their air is safe to breath [sic] and the water is safe to drink" (quoting Whitman).

- September 21, 2001: "EPA Disaster Response Update NYC Monitoring Efforts Continue to Show Safe Drinking Water, Air" (press release heading). "New Yorkers and New Jersians need not be concerned about environmental issues as they return to their homes and workplaces. Air quality monitoring data in residential areas has been consistently reassuring" (quoting Whitman).

- October 3, 2001: "Data Confirms No Significant Public Health Risks; Rescue Crews and Nearby Residents Should Take Appropriate Precautions . . ." (press release sub-heading).

- October 30, 2001: "While we have fortunately not found levels of contaminants that pose a significant health risk to the general public, our efforts to monitor the area and keep the public informed of our findings have not waned."

(Id. ¶ 128.)  Plaintiffs state that these statements are

remarkable given that the EPA's own tests revealed that the WTC

dust contained concentrations of asbestos at levels above the "so-called 1% danger threshold."  (Id. ¶ 129.)

The EPA made various other statements to the public that minimized the risks posed to the public by the WTC dust and contained an overriding message of reassurance.  On September 13, 2001, The New York Times reported that Whitman had said that "some chemicals that were of theoretical concern in the hours after the collapse, especially lead, . . . had not been detected in quantities high enough to raise alarm."  (Id. ¶ 135.) However, tests conducted by the EPA on September 26, 2001 revealed elevated readings for lead; these results were not released until the end of October, 2003.  On October 28, 2003, at a Congressional hearing, the EPA disclosed that 13.5% of apartments tested showed elevated lead levels.  (Id. ¶ 75.)

In the same September 13, 2001 article in The New York Times, Whitman was reported to have also stressed that asbestos levels were a concern only to rescue workers and work crews and not to residents near the Ground Zero site.  This was echoed by an EPA spokesperson, who stated on or about September 18, 2001 that "there are small pockets of asbestos" and that the concern was not for the city or residents, but for the rescue workers. On September 14, 2001, an Associated Press article reported a statement made by Whitman the previous day that "there's no

immediate health threat to people outside the ground zero area."
Also on September 14, 2001, the EPA and the Occupational Safety
and Health Administration ("OSHA") reported in a press release
that although the EPA had found variable asbestos levels in the
dust and debris, the EPA continued to believe there was no
significant health risk to the general public and that
appropriate steps were being taken to clean up the dust and
debris.  The EPA continued to make a distinction between any
potential risks to residents and workers at Ground Zero in press
releases and articles throughout the next several months.  (Id. ¶
135.)

        In all of the EPA's public statements about asbestos, the
EPA repeatedly referred to the fact that 1% of asbestos or above
constitutes "asbestos material" or "asbestos containing
material."  However, the EPA failed to disclose that 1% asbestos
is not a health-based standard, but pertains to whether solid
asbestos building materials should be removed professionally.
Levels of less than 1% can still pose a danger.  (Id. ¶ 136.)

        According to Plaintiffs, at the time the EPA made these
reassuring statements, they did not have sufficient information
and data.  The EPA's Office of Research and Development lacked
the monitoring data necessary to make health risk evaluations for
exposure to the air in the first few days after the WTC collapse.

Sampling of several potential pollutants did not even begin until September 16, 2001, and in many cases, results of those samples were not available by September 18, 2001, when the EPA made its statement that the public could return to Lower Manhattan.  (Id. ¶ 133.)

The EPA's own Office of the Inspector General criticized the EPA's response to the WTC Collapse.  The OIG Report stated that the EPA did not have available data and information to support the EPA's statement in the September 18, 2001 press release that the air was "safe" to breathe:

> At [the time the EPA made the announcement], air monitoring data was lacking for several pollutants of concern, including particulate matter and polychlorinated biphenyls (PCBs) . . . .  An EPA draft risk evaluation completed over a year after the attacks concluded that, after the first few days, ambient air levels were unlikely to cause short-term or long-term health effects to the general population.  However, because of numerous uncertainties -- including the extent of the public's exposure and a lack of health-based benchmarks -- a definitive answer to whether the air was safe to breathe may not be settled for years to come.

(Id. ¶ 132.)


2.    The EPA's Legal Responsibilities Under Federal Law

According to Plaintiffs, the EPA has clear authority to respond to the release of hazardous substances that may present

an imminent and substantial danger to the public health or welfare. (Id. ¶ 155; see 42 U.S.C. § 9604.)

In addition to being given the lead role under the FRP and ESF #10 pursuant to the Stafford Act, the EPA was specifically mandated to clean up building interiors following the September 11, 2001 attacks by provisions of Presidential Decision Directive 62 ("PDD 62"), signed by President Clinton in 1998.[6] PDD 62 assigns lead responsibility to the EPA for cleaning up buildings and other sites contaminated by chemical or biological agents as a result of terrorism. In her testimony before a Senate Subcommittee in November, 2001, Whitman acknowledged this mandate:

> Under the provisions of PDD 62, signed by President Clinton in 1998, the EPA is assigned lead responsi-bility for cleaning up buildings and other sites contaminated by chemical or biological agents as a result of an act of terrorism. This responsibility draws on our decades of experience in cleaning up sites contaminated by toxins through prior practices or accidents.

(Id. ¶ 142.) Horinko also testified that pursuant to PDD 62, the EPA is responsible for clean-up of the inside of buildings in the event of terrorism or a disaster. (Id. ¶ 143.) The Department

---

[6] An unclassified abstract of PDD 62 can be found at http://www.ojp.usdoj.gov/odp/docs/pdd62.htm. The abstract does not contain the section cited by Plaintiffs as providing the EPA with lead responsibility for cleaning up sites contaminated by chemical or biological agents as a result of terrorist acts.

of Homeland Security confirmed the EPA's mandate in the July 2002 National Strategy for Homeland Security, which stated that after a "major incident," the EPA is responsible for decontamination of affected buildings and neighborhoods and providing advice and assistance to public health authorities in the determination of when it is safe to return to affected areas. (Id. ¶ 145.) Plaintiffs allege that, according to PDD 62, the EPA had to maintain lead responsibility of clean-up of building interiors, as well as outdoor air.

The EPA is also part of the United States Government Interagency Domestic Terrorism Concept of Operations Plan ("CONPLAN"), which is a Federal signatory plan among six Federal departments. CONPLAN provides guidance to Federal, State and local agencies on how the Federal government should respond to a terrorist attack in a manner consistent with PDD 39 and 62. CONPLAN clearly states that applicable statutory authorities are modified by PDD 39 and 62. (Id ¶ 150.) Both Whitman and Horinko were aware of CONPLAN. (Id. ¶ 151.)

The EPA is allowed to assign lead responsibility for a portion or all of a removal activity, pursuant to an agreement with a State or a political subdivision thereof. See 40 C.F.R. §

30.6205.[7]  However, Plaintiffs allege that the EPA is prohibited from doing so if a Presidential Directive dictates otherwise. (Id. ¶ 149.)  As previously stated, Plaintiffs appear to interpret the fact that PDD 62 specifically mandated that the EPA take lead responsibility for cleaning up buildings and other sites contaminated by hazardous and chemical agents as just such a prohibition.  (Id. ¶ 141.)

Even in the absence of PDD 62, Plaintiffs allege that the NCP prohibited the EPA from delegating the responsibility to the City.  According to the NCP, the EPA can give away lead responsibility to a political subdivision of a State only "if both the State and EPA agree" to do so and the political subdivision has the "necessary capabilities and jurisdictional authority."  (Id. ¶ 152; see also 40 C.F.R. § 35.6205.)

---

[7]  "Remove" or "removal" is defined in CERCLA as

the cleanup or removal of released hazardous sub-
stances from the environment, such actions as may
be necessary taken in the event of the threat of
release of hazardous substances into the environment,
such actions as may be necessary to monitor, assess,
and evaluate the release or threat of release of
hazardous substances, the disposal of removed ma-
terial, or the taking of such other actions as may
be necessary to prevent, minimize, or mitigate da-
mage to the public health or welfare or to the
environment, which may otherwise result from a
release or threat of release. . . .

42 U.S.C. § 9601(23).

Plaintiffs claim that "Given the City's lack of funds and its expressed intent to leave the cleaning up to the public, it was beyond question that after 9/11 the City lacked the capabilities necessary to execute an interior clean-up of Lower Manhattan and Brooklyn." (Id. ¶ 152.)

Moreover, Plaintiffs state that, as administrator of the NCP, the EPA has the responsibility through On-Scene Coordinators ("OSCs"), who are predesignated by the EPA, to direct response efforts and coordinate all other efforts at the scene of a release. Hence, Plaintiffs allege that even if the EPA could delegate responsibility for the clean-up, it could not do so completely and must retain some responsibility. (Id. ¶ 153; see 40 C.F.R. § 300.175.)

### 3. The EPA's Delegation of Indoor Clean-Up to the City of New York

Initially, in the immediate aftermath of the September 11, 2001 attacks, Whitman made statements indicating that the "EPA would fulfill its mandate to take the lead in the environmental clean-up." (Id. ¶ 121.) In the September 14, 2001 issue of Newsweek, Whitman is quoted as saying "We're getting in there and testing to make sure things are safe . . . . Everything will be vacuumed that needs to be, air filters (in area buildings) will

be cleaned, we're not going to let anybody into a building that isn't safe.  And these buildings will be safe."  (Id. ¶ 122.) She stated in a <u>New York Daily News</u> article, published three days after the attacks, that "The President has said, 'Spare no expense, do everything you need to do to make sure the people of the city and down in Washington are safe as far as the environment is concerned.'" (Id ¶ 121.)

The EPA soon switched course, however, and made many statements that the EPA was not responsible for the clean-up of building interiors and did not have jurisdiction over indoor air quality.[8]  (Id. ¶ 160.)

Instead of taking the lead in the clean-up efforts of building interiors, the EPA allegedly passed the responsibility off to the City of New York ("the City").  (Id. ¶ 161.)  The EPA then failed to ensure that the City adhered to EPA cleaning standards for removal of hazardous materials.  Instead, the EPA deferred to the City's judgment, although the EPA and Whitman have admitted that EPA standards are materially stricter than those the City endorsed.  (Id. ¶ 8.)  This was contrary to NCP

---

[8]  Plaintiffs note that the NCP does not delineate between indoor and outdoor air; it authorizes the EPA to "enter any vessel, facility, establishment or other place, property, or location . . . and conduct, complete, operate, and maintain any response actions authorized by CERCLA or these regulations." (Id. ¶ 155; 40 C.F.R. § 300.400(d).)

regulations which state that "Only those state standards that . . . are more stringent than Federal requirements may be applicable or relevant and appropriate."  40 C.F.R. § 300.400(g)(4).

According to Plaintiffs, because the City was ill-equipped to handle the clean-up, the City, with the EPA's knowledge and consent, passed the responsibility for testing and remediation of indoor spaces to individual building owners and tenants.  (Id. ¶ 163.)  Individuals were referred to the New York City Department of Health (NYCDOH) for recommendations on reoccupying homes and businesses.  The NYCDOH guidelines, recommended by New York City and endorsed by the EPA, were grossly inadequate.  The guidelines included instructions to wear masks, long-sleeved clothing and closed-toe shoes while following the NYCDOH cleaning procedures. The guidelines also advised residents to remove dust with a wet rag or wet mop which could then be rinsed under running water. NYCDOH recommended using HEPA (high efficiency particulate air) filtration vacuums when cleaning up apartments, if possible; if not possible, NYCDOH recommended that HEPA bags and dust allergen bags be used with a regular vacuum.  In the alternative, NYCDOH suggested wetting down and removing the dust in accordance with its guidelines.  The guidelines also recommended shampooing and vacuuming carpets and upholstery, and using air purifiers to remove dust from the air.  (Id. ¶ 166.)

The EPA did not give any precautionary instructions and did not instruct residents to have the cleaning done professionally, although this is their conceded position. Whitman acknowledged in "The NewsHour with Jim Lehrer" on April 16, 2002 that professional cleaning was mandated for an adequate cleaning. (Id. ¶ 167.) The EPA also did not inform the public that the NYCDOH guidelines were meant to apply only to spaces that had been pre-cleaned or tested for asbestos and other toxic substances, as it later claimed. In addition, the EPA did not urge the City to use the most up-to-date testing method for asbestos; the City advised building owners to use an older technique which did not reveal all asbestos fibers. (Id.)

Plaintiffs argue that the EPA's careless handling of indoor clean-up in Lower Manhattan was at odds with the heavy regulation of asbestos by the Federal government. The EPA has listed asbestos as a Group A (known) human carcinogen. (Id. ¶ 89.) Exposure to asbestos can lead to, among other diseases, asbestosis, lung cancer and mesothelioma.[9] (Id.) Asbestos is regulated under various Federal statutes, including the Clean Air

_____

[9] Asbestosis is a serious progressive long-term disease of the lungs. Symptoms include shortness of breath and a dry, crackling sound in the lungs. There is no effective treatment for asbestosis. Mesothelioma is a rare, generally fatal form of cancer; cancer cells are found in the mesothelium, a protective sac that covers most of the body's internal organs. (Id. ¶ 89.)

Act, the Toxic Substances Control Act, the Emergency Planning and Community Right-to-Know Act and CERCLA.  Applicable regulations are found in the National Emission Standards of Hazardous Air Pollutants, standards promulgated by OSHA,[10] and regulations under the Toxic Substances Control Act.  (Id. ¶¶ 91-112.)

In cleaning its own building in Lower Manhattan, 290 Broadway, the EPA utilized the most up-to-date method of asbestos testing, TEM, when testing the indoor dust.  In addition, the entire building was professionally and systematically cleaned, displacing all EPA personnel for one week.  This process was far more thorough and stringent than the procedures set forth in the NYCDOH guidelines.  Yet, the EPA did not disclose the fact of this cleaning until months after the WTC Collapse, and instead, minimized the steps it had taken.  Plaintiffs state that 290 Broadway is beyond the geographical area covered by the EPA's voluntary clean-up program initiated in mid-2002.  (Id. ¶ 140.)

Plaintiffs argue that as a result of the EPA's actions, there has been inadequate indoor hazardous materials remediation, and a threat to public health remains.  Many residential and commercial spaces were cleaned as if the dust did not contain hazardous materials.  About 40% of downtown residents reported

---

[10]  The EPA adopted the OSHA Asbestos Standards in January, 2000.  (Id. ¶ 168.)

that they were not given any instructions for clean-up or hazardous remediation. Even when residents and building owners had notice of the instructions, many failed to do any remediation, or to do it properly. Often, the reasons for this included the lack of financial resources of residents and business owners and inadequate enforcement measures. (Id. ¶¶ 170-183.) The NYCDOH enforcement measures consisted of a letter sent to building owners around February, 2002, requesting documentation of clean-up measures taken. Plaintiffs believe that only a small number of landlords responded to this request. (Id. ¶ 186.)

### 4. The EPA's Voluntary Clean-Up Program

Under pressure from EPA Ombudsman hearings held in February and March, 2002,[11] politicians and the community, in February, 2002, Whitman announced the establishment of a task force to address the issue of indoor air. According to a former EPA Chief of Staff, the EPA initiated this effort because "Over time, we saw that New York City was not prepared to handle all the issues

---

[11] According to Plaintiffs, the EPA "brazenly refused to testify at the hearings, which, according to then-Ombudsman Robert Martin, was the first such Agency refusal in his nine-year tenure." The EPA allegedly stated that the hearing "may be off-off Broadway, but it is still pure theatre." (Id. ¶ 190.)

related to indoor air and offered to support them."  (Id. ¶ 191.)
In April, 2002, before the task force initiated any actual
interior clean-up program, New York City's Mayor, Michael
Bloomberg, requested that the EPA take the lead on indoor air
issues arising from the WTC Collapse.  (Id.)

On May 8, 2002, the EPA, New York City and FEMA officials
publicly announced a FEMA-funded clean-up program, which the EPA
characterized as a "removal" under 40 C.F.R. § 300.415.[12]  (Id.
¶¶ 191-92.)  Lower Manhattan residents, living south of Canal
Street, could request testing and cleaning of their residences,
or just testing of their residences.  Office buildings were
omitted from the program.  Residents requesting the "testing
only" option could choose between aggressive sampling or modified
aggressive sampling.  For either option, air samples were to be
analyzed for asbestos only, despite the fact that the EPA had
reason to believe that other contaminants were present at
unhealthy levels.  The EPA also planned to collect pre-and post-
cleaning wipe samples for a limited number of residents
(approximately 250) and test these samples for dioxin, total
metals and mercury.  (Id. ¶ 193.)  For the "cleaning and post-
cleaning" option, two approaches were used to clean the

_____

[12]  See supra footnote 7, p.20.

27

residences.  First, the extent of dust contamination was determined through visual inspection.  If the EPA believed there to be "substantial" dust, abatement workers were to use full protective equipment, including full body suits and HEPA respirators; residents would not be allowed to be present for a week while the cleaning took place and the apartment would be sealed off.  (Id. ¶ 194.)

By December, 2002, the EPA had cleaned fewer than 500 homes. (Id. ¶ 192.)

Plaintiffs claim that this voluntary clean-up clearly demonstrates that there were hazards to all citizens who cleaned their apartments and offices of significant accumulations of dust and debris in accordance with NYCDOH guidelines.  Also, Plaintiffs claim that the voluntary clean-up effort was grossly inadequate because the EPA only tested for asbestos, the geographical coverage (residences south of Canal Street) was limited and set arbitrarily, and the EPA has not required all apartments within a building to be cleaned which has led to re-contamination of clean residences.  Furthermore, office buildings and other workplaces, including firehouses, were excluded from the program.  (Id. ¶ 196.)  The EPA refused to expand the list of hazardous substances to be tested and has continued to collect only air samples, which cannot reveal deposits of contaminants

such as lead on the floor or in carpets.  (Id. ¶¶ 200, 202.)

The clean-up program reportedly ended in the Summer of 2003. Approximately 4,100 of 21,000 dwelling units were tested and/or cleaned.  Even after cleaning, tests of some units still showed contamination above the health-based benchmark.  (Id. ¶ 208.) The final report of the New York City Department of Health and Mental Hygiene and U.S. Department of Health and Human Services, Public Health Services, Agency for Toxic Substances and Disease Registry, issued in September, 2002, revealed that almost 20% of apartments tested in Lower Manhattan still had interior dust with measurable levels of asbestos.  (Id. ¶ 210.)

Researchers have concluded that the cleaning has not removed all contaminants, and that WTC dust and public health risks are higher than estimated by governmental agencies.  (Id. ¶¶ 211-16.) In fact, the EPA now admits that residents may have long-term health risks associated with the WTC Collapse.  (Id. ¶ 219.)

Plaintiffs claim that as a result of Defendants' wrongdoing, they have been exposed to hazardous substances for over three years and have been left with the expense of full and proper clean-up of their residences and workplaces, as well as the possibility that they may face serious long-term health

effects.[13]  (Id. ¶ 13.)


## II.  DISCUSSION

Individual Defendants and EPA Defendants have moved to dismiss all claims against them.


### A.  Individual Defendants

Individual Defendants Christine Todd Whitman and Marianne Horinko move to dismiss Count One of the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Count One charges Whitman and Horinko with violating Plaintiffs' Fifth Amendment rights. Individual Defendants argue that the qualified immunity doctrine shields them from personal liability for their actions taken within the scope of their employment with the EPA.  Their argument for dismissal is based on three grounds:  (1) Plaintiffs fail to plead facts that establish "any cognizable exception" to the qualified immunity protecting Individual Defendants and instead have invented "novel 'constitutional rights'" which they allege defendants violated -- constitutional rights that were not clearly established on September 11, 2001; (2) Plaintiffs' due

---

[13]  Paragraphs 15 through 25 of the Amended Complaint describe the named Plaintiffs in the suit and ways in which their health has been affected by the WTC Collapse.

process claim fails as a matter of law because it relies on statutes and provisions that grant discretionary authority to Individual Defendants; and (3) Plaintiffs also fail to demonstrate that Individual Defendants had an affirmative constitutional duty to protect Plaintiffs from the hazardous substances released into the environment by the September 11, 2001 attacks, and also fail to plead facts that support exceptions under the qualified immunity doctrine.  (Ind. Defs.' Mem. Law at 3-4.)

Plaintiffs argue that Individual Defendants are not immune from personal liability because Count One is based on well-established constitutional rights.


### 1.  Rule 12(b)(6)

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff."  <u>Bolt Elec., Inc. v. City of New York</u>, 53 F.3d 465, 469 (2d Cir. 1995) (citations omitted).  "The district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

<u>Harris v. City of New York</u>, 186 F.3d 243, 247 (2d Cir. 1999).

A qualified immunity defense can be presented in a Rule 12(b)(6) motion as long as the defense is based on facts appearing on the face of the complaint.  <u>McKenna v. Wright</u>, 386 F.3d 432, 436 (2d Cir. 2004).  However, a qualified immunity defense raised in a motion to dismiss "must accept the more stringent standard applicable to this procedural route.  Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  <u>Id.</u> (citations and internal quotations omitted).  The Rule 12(b)(6) standard that the plaintiff is entitled to all reasonable inferences from the facts alleged in the complaint applies to those facts that support his claim, and also those that defeat the immunity defense.  <u>Id.</u>

### 2.  Qualified Immunity

Individual Defendants argue that Count One must be dismissed because they are shielded by qualified immunity.[14]

---

[14]  Although Plaintiffs do not explicitly state that Count One is a <u>Bivens</u> action in their Amended Complaint, they make this clear in their Memorandum of Law.  Count One rests upon an implied private action for damages against Federal officers

"Qualified or 'good faith' immunity is an affirmative
defense that must be pleaded by a defendant official."  <u>Harlow v.
Fitzgerald</u>, 457 U.S. 800, 815 (1982) (quoting <u>Gomez v. Toledo</u>,
446 U.S. 635 (1980)).  Such a defense "serves important interests
in our political system.  It protects government officials from
liability they might otherwise incur due to unforeseeable changes

_____

alleged to have violated Plaintiffs' constitutional rights,
first recognized by the Supreme Court in <u>Bivens v. Six Unknown
Fed. Narcotics Agents</u>, 403 U.S. 388 (1971). (<u>See</u> Pls.' Mem. Law
at 5.)  A <u>Bivens</u> action permits victims of alleged constitutional
violations by Federal officials to recover damages despite the
absence of a statute specifically conferring such a cause of
action.  <u>See</u> <u>Carlson v. Greene</u>, 446 U.S. 14, 18 (1980).

     A <u>Bivens</u> action, however, may not be brought against Federal
officials in their official capacity, and may only be brought
against them in their individual capacities.  The doctrine of
sovereign immunity shields the United States against actions for
damages absent consent.  <u>See</u> <u>Robinson v. Overseas Military Sales
Corp.</u>, 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action
against a Federal agency or Federal officers in their official
capacities is essentially a suit against the United States, such
suits are also barred under the doctrine of sovereign immunity,
unless such immunity is waived.") (citing <u>Federal Deposit Ins.
Corp. v. Meyer</u>, 510 U.S. 471, 485-86 (1994)).  Damages relief
against Federal defendants in their individual capacities can be
maintained as <u>Bivens</u> actions and are not barred by sovereign
immunity.  However, they may be subject to the defenses of
absolute or qualified immunity.  <u>See</u> <u>Liffiton v. Keuker</u>, 850 F.2d
73, 78 (2d Cir. 1988).

     The Amended Complaint does not specify whether Plaintiffs
are suing the Individual Defendants in their official or
individual capacities.  However, because Plaintiffs do not
specify in what capacity they are suing Individual Defendants,
the Court shall consider this  cause of action as against
Individual Defendants in their individual capacities.

in the law governing their conduct." Sound Aircraft Services, Inc. v. Town of East, 192 F.3d 329, 334 (2d Cir. 1999). Qualified immunity also serves the important public interest of "protecting public officials from the costs associated with the defense of damages actions . . . [including] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accepting public positions." Crawford-El v. Britton, 523 U.S. 574, 590 at fn.12 (1998). Qualified immunity is not merely a defense; it is also "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

Qualified immunity shields a defendant from liability "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Johnson v. Newburgh Englarged Sch. Dist., 293 F.3d 246, 250 (2d Cir. 2001); Brosseau v. Haugen, 125 S.Ct. 596, 599 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); see also Harlow, 457 U.S. at 818-19.

"[A] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation

34

of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Determining the constitutional question first serves two purposes: it spares the defendant of unwarranted demands and liability "customarily imposed upon those defending a long drawn-out lawsuit" and also "promotes clarity in the legal standards for official conduct, for the benefit of both the officers and the general public." Id.

If a deprivation of a constitutional right has been alleged, a court must determine whether the constitutional right was clearly established by determining: (1) if the law was defined with reasonable clarity, (2) if the Supreme Court or the law of the Second Circuit affirmed the rule, and (3) whether a reasonable defendant would have understood from existing law that the conduct was unlawful. See Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 634, 640 (1987). The specific action in question does not have to have been explicitly deemed unlawful by the courts, but its unlawfulness in light of pre-existing law

must be apparent.  Id.  "An overly narrow definition of the right can effectively insulate the government's actions by making it easy to assert that the narrowly defined right was not clearly established."  LaBounty v. Coughlin, 137 F.3d 68, 73-74 (2d Cir. 1998).  At the same time, the right cannot be defined too broadly, as that would convert the rule of qualified immunity into one of virtually unqualified liability.  Id.

Even if a court finds that the right is clearly established, "defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established protection."  LaBounty, 137 F.3d at 73 (2d Cir. 1998). "[R]easonableness is judged against the backdrop of the law at the time of the conduct . . . . [T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."  Brosseau, 125 S.Ct. at 599.

> ### a. Allegation of a Deprivation of a Constitutional Right

Plaintiffs contend that they have alleged a constitutional violation, namely a violation of their "substantive due process rights to bodily integrity and, more specifically, their right to be free of official government policies that increase the risk of

bodily harm."  (Pls.' Mem. Law at 3.)

Individual Defendants argue that no due process right requires the Government to protect the public from environmental hazards created by third parties.  (Ind. Defs.' Mem. Law at 13.) Specifically, Individual Defendants state that Plaintiffs' allegation fails the first prong of the qualified immunity test because "it does not take account of the particular context of this case" and instead, attempt to analogize the situation at issue here with cases that are completely dissimilar.[15]  (Id. at 4, 6.)  Individual Defendants make an additional argument that a constitutional violation has not been alleged because allegations that Individual Defendants acted with "deliberate indifference" do not state a violation of substantive due process rights, and Plaintiffs have failed to allege conduct that "shocks the conscience."[16]  (Id. at 9.)

---

[15]  Though Individual Defendants make this argument as part of their brief addressing Plaintiffs' failure to allege a constitutional violation, it appears to the Court that the argument is more properly directed toward the issue of whether the right alleged has been clearly established.

[16]  Individual Defendants dedicated a substantial portion of their initial Memorandum of Law to the argument that Count One should be dismissed because "Plaintiffs have no constitutional right to a healthful environment, or to a specific level or type of cleanup of environmental hazards."  (Ind. Defs.' Mem. Law at 6.)  They argue that Plaintiffs' substantive due process claim fails because they lack any statutory or regulatory entitlement or property interest.  (Id. at 3, 7-8.)

The Due Process Clause provides that "No person . . . shall be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. The Supreme Court has recognized that this clause includes a substantive component, "which forbids the government to infringe certain 'fundamental' liberty interests <u>at all</u>, no matter what process is provided, unless that infringement is narrowly tailored to serve a compelling state interest." <u>Reno v. Flores</u>, 507 U.S. 292, 302 (1993); <u>see also</u> <u>Washington v. Glucksberg</u>, 521 U.S. 702, 719 (1997) ("The Due Process Clause guarantees more than fair process . . . .") (emphasis added). "The Due Process Clause . . . was

───────────────

However, it is clear from Plaintiffs' Amended Complaint and their opposition brief that Count One is based upon a violation of Plaintiffs' substantive due process right to be free of government policies that increase the risk of bodily harm. (Am. Compl. ¶¶ 221-29; Pls' Mem. Law at 5.) In their reply, Individual Defendants state that "Plaintiffs concede that the substantive due process claim they assert . . . is not based upon any of the Federal statutes or regulations Plaintiffs cite in their Amended Complaint." (Ind. Defs.' Reply at 1.) However, by letter, dated July 7, 2005, the Individual Defendants brought to the Court's attention a recent Supreme Court case, <u>Town of Castle Rock, Colorado v. Gonzalez</u>, 125 S.Ct. 2796 (2005), where the Supreme Court recognized that neither a substantive nor procedural due process right arises from statutes that confer discretionary authority on government actors. As Plaintiffs have clarified in their memoranda of law, they are not claiming a substantive due process violation based on any statute, entitlement or property interest. As such, the Court finds that <u>Town of Castle Rock</u> is not relevant to the analysis of whether an allegation of a constitutional deprivation has been made in this case.

intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" Collins v. Harker Heights, 503 U.S. 115, 126 (1992) (quoting DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 196 (1989)).

The Supreme Court has recognized a substantive due process right to bodily integrity. See Albright v. Oliver, 510 U.S. 266, 272 (1994); Planned Parenthood v. Casey, 505 U.S. 833 (1992); Washington v. Harper, 494 U.S. 210 (1990); Winston v. Lee, 470 U.S. 753 (1985); Rochin v. California, 342 U.S. 165 (1952). However, "as a general matter . . . a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 197 (1989). The language of the Due Process Clause does not "requir[e] the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." Id. at 195. The Due Process Clause was included in the Constitution to "protect the People from the State, not to ensure that the State protected them from each other." Id. at 196. In DeShaney, the Supreme Court found that there was no violation of the plaintiff's substantive due process rights in a case where the State had been

aware of a child's physical abuse by his father yet failed to remove the child from his father's custody.

The Supreme Court recognized, however, that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." Id. at 198. Two such circumstances, referred to by the Supreme Court in DeShaney, have been recognized by the circuit courts. One such circumstance arises when the State "takes a person into its custody and holds him there against his will," thereby depriving him of liberty. DeShaney, 489 U.S. at 199-200. This is often referred to as the "special relationship" doctrine. The DeShaney court also recognized a second possible set of circumstances where the state could be held liable for harm inflicted on an individual by third parties, when it said that:

> While the State may have been aware of the dangers that [the child, Joshua] faced in the free world, it played no part in their creations, nor did it do anything to render him more vulnerable to them.

Id. at 201. This exception to the DeShaney rule has been termed the "state-created danger" doctrine. Plaintiffs claim that their allegation of a violation of their substantive due process rights falls under this second doctrine.

All the circuit courts have recognized this "state-created

danger" doctrine. See Coyne v. Cronin, 386 F.3d 280, 287 (1st Cir. 2004) (stating that the "Due Process Clause may be implicated where the government affirmatively acts to increase the threat to an individual of third-party private harm"); Butera v. District of Columbia, 235 F.3d 637, 651 (D.C. Cir. 2000) (holding that "under the State endangerment concept, an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm."); Penilla v. City of Huntington Park, 115 F.3d 707, 709 (9th Cir. 1997) (stating that "when a state officer's conduct places a person in peril in deliberate indifference to their safety, that conduct creates a constitutional claim"); see also Kneipp v. Tedder, 95 F.3d 1199, 1205, 1208 (3d Cir. 1996); Pinder v. Johnson, 54 F.3d 1169, 1175-77 (4th Cir. 1995) (en banc); McKinney v. Irving Independent School District, 309 F.3d 308, 313 (5th Cir. 2002); Kallstrom v. City of Columbus, 136 F.3d 1055, 1066 (6th Cir. 1998); Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir. 1993), cert. denied, 510 U.S. 947 (1993); Avalos v. City of Glenwood, 382 F.3d 792, 799 (8th Cir. 2004); Uhlrig v. Harder 64 F.3d 567, 572 n.7 (10th Cir. 1995), cert. denied, 516 U.S. 1118 (1996); Wyke v. Polk County Sch. Bd., 129 F.3d 560, 567 (11th

Cir. 1997).

The Second Circuit as well has recognized this state-created danger doctrine and has stated that:

> the DeShaney Court's analysis [implies] that, though an allegation simply that police officers had failed to act upon reports of past violence would not implicate the victim's rights under the Due Process Clause, an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate those rights.

Dwares v. City of New York 985 F.2d 94, 99 (2d Cir. 1993) (emphasis added).  The Second Circuit has made it clear that it treats "special relationships and state created dangers as separate and distinct theories of liability."  Pena, 2005 WL 3340380, at *7.  "[S]tate created danger liability arises from the relationship between the state and the private assailant" and not the state and the victim.  Pena, 2005 WL 3340380, at *7 (internal quotations marks omitted).

In applying the state-created danger doctrine, the Second Circuit has "sought to tread a fine line between conduct that is 'passive' as in DeShaney and that which is 'affirmative' as in Dwares."  Pena v. Deprisco, No. 03-7876 (L), 03-7962 (CON), 03-7880 (CON), 03-7929 (CON), 03-7940 (CON), 2005 WL 3340380, at *7 (2d Cir. Dec. 9, 2005).  See also Hemphill v. Schott, 141 F.3d 412, 418 (2d Cir. 1998) (finding that state actors also can be found to have violated due process rights "where the state actors

42

actually contributed to the vulnerability of the plaintiff.").

In Dwares, the court found that plaintiff stated a claim for deprivation of his substantive due process rights by alleging that defendant police officers agreed with a group of skinheads to allow them to assault plaintiff with impunity, stood by without interfering when plaintiff was beaten, and did not arrest the assaulters. The Second Circuit found that the defendant officers' prior indication to the skinheads that they would not intervene, as well as their subsequent failure to prevent harm to the plaintiff affirmatively increased the danger the plaintiff faced from the group of skinheads who attacked him. The Second Circuit found Dwares distinguishable from DeShaney because the complaint "went well beyond allegations that the defendant officers merely stood by and did nothing." In Pena v. DePrisco, 2005 WL 3340380 (2d Cir. Dec. 9, 2005), plaintiffs' allegations that defendants communicated to the police officer that he was free to drink excessively and drive in that condition, and "encouraged to inappropriately and excessively drink while on and off-duty" were found sufficient to allege state-created danger. Merely alleging a failure to interfere when misconduct takes places, and nothing more, however, is not sufficient in pleading a constitutional violation based on the state-created danger doctrine. Id., at *8.

The D.C. Circuit has similarly held that "an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm." Butera, 235 F.3d 637, 651. In Butera, the D.C. Circuit Court found that a violation of a substantive due process right was alleged by the estate of an undercover operative for the Metropolitan Police Department of the District of Columbia who died during an undercover operation. The estate alleged that the Police Department had not fully advised the undercover of the potential risks, and that appropriate precautions had not been taken to ensure his safety. Relying on Butera, a district court in the District of Columbia recognized the state-created danger exception in a suit filed by postal workers exposed to anthrax when a letter addressed to Senator Tom Daschle was processed at the Washington, D.C. postal facility where they worked.[17] Briscoe v. Potter, 355 F. Supp. 2d 30 (D.D.C. 2004). The Briscoe court found that the defendants took the requisite "affirmative

---

[17] A contrary conclusion was reached in Richmond v. Potter, No. 03-00018, slip op. (D.D.C. Sept. 30, 2004), another case involving the same anthrax incident. That court found that the plaintiff failed to allege a constitutional deprivation because the conduct of defendants did not arise to one that shocked the conscience.

actions" by "engaging in a series of actions which intentionally misled Plaintiffs into believing the facility was safe and prevented them from acting to preserve their own safety."  355 F. Supp. 2d at 44-45.

Any allegation of a deprivation of the substantive due process right based on the state-created danger doctrine must "shock the conscience."  "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."  County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998).  In order for a substantive due process allegation to survive a Rule 12(b)(6) motion, the complaint "must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847, n.8 (1998)).  The plaintiff must satisfy the "intent to harm" standard to prove that the police officers' behavior in the context of a high-speed chase, was conscience-shocking.  Sacramento, 523 U.S. at 854.  However, allegations of "less than intentional conduct . . . may be actionable," though the plaintiff must allege "something more than negligence." Id. at 848.

In some circumstances, deliberate indifference by officials

may satisfy the "shocks the conscience" test.  Such is the case in prison cases where the State has taken an individual into its custody and "so restrains [his] liberty that it renders him unable to care for himself."  Id. at 851.  Deliberate indifference can also shock the conscience in non-custodial situations when "the State also owes a duty of protection when its agents create or increase the danger to an individual."  Butera, 235 F.3d at 652.  Alleged behavior "over an extended period of time and in the face of action that presents obvious risk of severe consequences and extreme danger" can also be characterized as conscience-shocking.  Pena, 2005 WL 3340380, at *11 (finding that police officers who had ample opportunity to decide what to do and say in response to the alleged practice of drinking and driving by off-duty officers, when the risk of drinking and driving was widely known and yet did nothing, created a serious danger by acting with conscience-shocking deliberate indifference).

Plaintiffs allege a violation of their substantive due process rights by actions taken by Defendants Whitman and Horinko.  Specifically, Plaintiffs allege the following acts:

- Whitman made affirmative statements that the EPA would clean up building interiors to an acceptable level of safety, and failed to do so, and allowed residents, office workers, firefighters and school children to return to their buildings on September 17, 2001;

- Whitman's and Horinko's knowingly false statements were disseminated to victims of the attack regarding the air quality;

- Whitman and Horinko illegally and improperly delegated to New York City indoor clean-up;

- Whitman and Horinko endorsed and disseminated New York City's grossly improper cleaning instructions; and

- Whitman and Horinko generally failed to ensure a clean-up of the impact area of the WTC attack and to ensure the decontamination of buildings containing carcinogens and other hazardous substances.

(Am. Compl. ¶ 223.)

Plaintiffs' allegations that Whitman and Horinko must be held liable because they intentionally shirked EPA's duties and laws, including the PDD 62, the Federal Response Plan and other Federal law, by their improper delegation of all indoor clean-up to the City of New York, and implementation of an inadequate voluntary clean-up program, are not properly directed towards Whitman and Horinko individually. Aside from their general allegation that Whitman and Horinko "were responsible for and did direct the formulation, implementation and enforcement of the EPA's policies with respect to WTC dust, [and] the clean-up of such dust in interior spaces," (Am. Compl. ¶ 29), and Whitman and Horinko's acknowledgment that as heads of the EPA, they had lead responsibility for clean-up, (id. ¶¶ 142-43), Plaintiffs fail to allege any actions that Whitman and Horinko took as individuals

in the delegation of authority to New York City, and the implementation of the clean-up program.  The allegations are in fact allegations against the agency itself, the EPA.  Indeed, the Court's careful review of the Amended Complaint does not reveal any specific mention of Whitman or Horinko in any portion of the Amended Complaint that deals with the alleged improper delegation of clean-up and the voluntary clean-up program.  Accordingly, the Court finds that Individual Defendants cannot be held liable for actions that were in fact taken by the EPA as an agency, and not individually by either Whitman or Horinko.

However, Plaintiffs also allege a number of deceptive and false statements made by Whitman and Horinko that placed Plaintiffs "directly in the path of danger, knowingly exposing them to asbestos and other carcinogens and hazardous substances, which in turn created a serious risk of significant long-term health problems."  (Pls.' Mem. Law at 2.)

In particular, the Amended Complaint alleges numerous false statements by Whitman which they say, increased their risk of bodily harm.  (See Am. Compl. ¶¶ 121, 122, 126, 128, 135 and 136.)  Whitman made these statements with the knowledge of the hazardous materials actually and potentially released into the environment and of the health dangers associated with such substances to the public through inhalation, ingestion and hard

contact.  (Am. Compl. ¶ 226.)  Whitman's deliberate and
misleading statements made to the press, where she reassured the
public that the air was safe to breathe around Lower Manhattan
and Brooklyn, and that there would be no health risk presented to
those returning to those areas, shocks the conscience.

The EPA is designated as the agency in our country to
protect human health and the environment, and is mandated to work
for a cleaner, healthier environment for the American people.
See EPA, "Our Mission",  http://www.epa.gov/epahome/about
epa.htm.  The agency enforces regulations regarding pollution in
our environment and the presence of toxic and hazardous
substances, and has endorsed and promulgated regulations for
hazardous and toxic materials, such as asbestos and lead.[18]  As

_____

[18]  **According to the EPA, it carries out its efforts to
protect the environment through the following laws: Federal Food,
Drug, and Cosmetic Act; Federal Insecticide, Fungicide, and
Rodenticide Act; Federal Water Pollution Control Act (also known
as the Clean Water Act); Clean Air Act; Shoreline Erosion
Protection Act; Solid Waste Disposal Act; National Environmental
Policy Act; Pollution Prevention Packaging Act; Resource Recovery
Act; Lead-Based Paint Poisoning Prevention Act; Coastal Zone
Management Act; Marine Protection, Research, and Sanctuaries Act;
Ocean Dumping Act; Endangered Species Act; Safe Drinking Water
Act; Shoreline Erosion Control Demonstration Act; Hazardous
Materials Transportation Act; Resource Conservation and Recovery
Act; Toxic Substances Control Act; Surface Mining Control and
Reclamation Act; Uranium Mill-Tailings Radiation Control Act;
Asbestos School Hazard Detection and Control Act; Comprehensive
Environmental Response, Compensation and Liability Act (CERCLA);
Nuclear Waste Policy Act; Asbestos School Hazard Abatement Act;
Asbestos Hazard Emergency Response Act; Emergency Planning and**

head of the EPA, Whitman knew of this mandate and took part in and directed the regulatory activities of the agency. Given this responsibility, the allegations in this case of Whitman's reassuring and misleading statements of safety after the September 11, 2001 attacks are without question conscience-shocking. The pleaded facts are sufficient to support an allegation of a violation of the substantive due process right to be free from official government policies that increase the risk of bodily harm by Defendant Whitman when she consistently reassured the members of the public that it was safe for them to return to their homes, schools and workplaces, just days following the September 11, 2001 attacks.

However, although Plaintiffs allege that Horinko made

---

Community Right to Know Act; Indoor Radon Abatement Act; Lead Contamination Control Act; Medical Waste Tracking Act; Ocean Dumping Ban Act; Shore Protection Act; and National Environmental Education Act. <u>See</u> <u>EPA, Laws and Regulations: Introduction to Laws and Regulations</u>, at http://www.epa.gov/epahome/lawintro.htm.

For example, under the Resource Conservation and Recovery Act, the EPA is required to "promulgate regulations for the treatment, storage, or disposal of hazardous waste . . . , as may be necessary to protect human health and the environment." 42 U.S.C. § 6924(a). The Clean Air Act requires the EPA to promulgate and establish emission standards for sources of hazardous air pollutants. 42 U.S.C. § 7412(d). Among the factors the EPA must consider when promulgating standards is the "known or anticipated adverse effects of such pollutants on public health and the environment." 42 U.S.C. § 7412(e)(2). Other major environmental laws contain similar provisions.

knowingly false statements to the public, no such statement can be found in the Amended Complaint.  It appears that Plaintiffs' allegation that Horinko violated their constitutional rights is actually based on Horinko's alleged participation in the delegation of the clean-up and the implementation of the clean-up program.  As the Court has determined that such actions are not attributable to Horinko individually, and there is not one allegedly false statement made by Horinko individually concerning the air quality in the Amended Complaint, Count One against Horinko is DISMISSED.


### b.  Clearly Established Constitutional Right

Defendant Whitman argues that if the Court finds that Plaintiffs alleged a deprivation of their substantive due process rights, that she is still entitled to qualified immunity because the right alleged by Plaintiffs was not clearly established at the time of Defendant Whitman's conduct.[19]  Plaintiffs disagree and contend that the right to be free of dangers created by government officials is clearly established in this Circuit.

The Second Circuit has found the state-created danger

_____

[19]  Because the Court has found that Plaintiffs have failed to allege unconstitutional acts by Horinko, the Court only addresses the argument of remaining Individual Defendant, Whitman, in this portion of the Opinion.

doctrine to apply in two instances.  The Second Circuit stated in
Dwares that plaintiff's allegations of "a prearranged official
sanction of privately inflicted injury" surely violated the
plaintiff's Due Process rights.  In Pena, the Second Circuit
found that "repeated inaction on the part of government officials
over a long period of time, without an explicit statement of
approval, might effectively constitute such an implicit 'prior
assurance'" that it rose to the level of an affirmative act.[20]

Defendant Whitman states that "There is no analogous claim
in this case that [Whitman] conspired with the 9/11 terrorists to
cause Plaintiffs to be exposed to hazardous substances."  (Ind.
Defs.' Mem. Law at 20.)  Defendant Whitman argues that there is
no "settled precedent that public misrepresentation by a
government official regarding potential dangers from
environmental hazards created by a third party's actions can be
construed, for due process purposes, as 'increasing the danger'

---

[20]  However, in Pena, the Second Circuit found that the
substantive due process violation alleged by plaintiff "was not
clearly established for purposes of qualified immunity.  Dwares
did not address, let alone decide, whether repeated inaction on
the part of government officials over a long period of time
without an explicit statement of approval, might effectively
constitute such an implicit 'prior assurance' that it rises to
the level of an affirmative act."  2005 WL 3340380, at *12.  Pena
is clearly distinguishable from this case; Plaintiffs allege
affirmative acts by Defendant, and not inaction, or implied
assurances by Defendant.

posed by those hazards."  (Id.)

　　　Defendant Whitman, however, seeks to define the contours of the state-created danger doctrine as recognized by the Second Circuit too narrowly.  As mentioned previously, in the context of qualified immunity, the Supreme Court has stated that the specific action in question does not explicitly have to have been deemed unlawful, as long as its unlawfulness in light of pre-existing law is apparent.  See Anderson v. Creighton, 483 U.S. 634, 640 (1987).  By stating that Plaintiffs need to have alleged a conspiracy between Defendant Whitman and the Al Qaeda terrorists in order to allege state-created danger, Defendant Whitman raises a rather specious argument which demonstrates a myopic view of the Plaintiffs' claim.  There is no question that Whitman did not conspire with Al Qaeda to harm Plaintiffs.  But by the time the Al Qaeda terrorists had committed their horrific acts, and the World Trade Center towers had collapsed, Whitman knew that the consequences of the terrorists' actions, namely causing the collapse of the World Trade Center, included the emission of tons of hazardous materials into the air.  It is at this point, when the harmful emissions created a danger to the public that Whitman, knowing the likely harm to those exposed to the hazardous materials, encouraged residents, workers and students to return to the area.  By these actions, she increased,

and may have in fact created, the danger to Plaintiffs, namely harm to their persons through exposure to the hazardous substances in the air after the WTC collapse. Without doubt, if Plaintiffs had not been told by the <u>head</u> of a federal agency entrusted with monitoring the environment that it was safe, plaintiffs would not have so readily returned to the area so soon after the attacks.

Defendant Whitman, like the defendant officers in <u>Dwares</u>, affirmatively took actions that increased or created the danger to Plaintiffs. If officials who conspire with others who harm others can be held liable under the state-created danger doctrine, it is even more clear that officials who themselves directly lead victims to a likely and/or known harm can be held liable under this doctrine. The Court, having found that the law of state-created danger was defined with reasonable clarity to give Defendant Whitman notice, also finds that no argument can be made that Defendant Whitman could not have understood from existing law that her conduct was unlawful. No reasonable person would have thought that telling thousands of people that it was safe to return to Lower Manhattan, while knowing that such return could pose long-term health risks and other dire consequences, was conduct sanctioned by our laws. The Court finds that Defendant Whitman is not entitled to the defense of qualified

immunity at this stage.  Accordingly, Individual Defendants'
Motion to Dismiss Count One is GRANTED in part as to Defendant
Horinko and DENIED in part as to Defendant Whitman.


B.  EPA Defendants

EPA Defendants move to dismiss the second and third causes
of action against them for lack of subject matter jurisdiction
and failure to state a claim.  The EPA, as the sole defendant
named in the fourth cause of action, moves to dismiss that claim
on the ground that Plaintiffs have failed to properly allege a
Comprehensive Environmental Response, Compensation and Liability
Act ("CERCLA") citizen suit claim.


1.  Legal Standards

EPA Defendants move to dismiss the claims against them under
Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil
Procedure.  The standards for dismissal under 12(b)(1) and
12(b)(6) are virtually identical.  <u>Lerner v. Fleet Bank, N.A.</u>,
318 F.3d 113, 128 (2d Cir. 2003).

Rule 12(b)(1) provides for dismissal of a claim when the
Federal court "lacks jurisdiction over the subject matter."  Fed.
R. Civ. P. 12(b)(1).  In deciding such a motion, a court must
assume as true all well-pleaded factual allegations in the

complaint and draw all reasonable inferences in favor of the plaintiff. Raila v. United States, 355 F.3d 118, 119 (2d Cir. 2004); Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000). Dismissal is appropriate only when the plaintiff can prove no set of facts entitling him to relief. Raila, 355 F.3d at 119. "But when the question to be considered is one involving the jurisdiction of a Federal court, the jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Shipping Financial Services Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998).

### 2. Second Cause of Action: APA Claim

EPA Defendants contend that the Administrative Procedure Act Claim must be dismissed because it is precluded by the Stafford Act's bar on judicial review, contained in 42 U.S.C. § 5148. In the event that the Court finds that judicial review is not precluded by the Stafford Act, EPA Defendants argue that judicial review is still unavailable because Plaintiffs have failed to identify any "agency action" by the EPA as required by the APA.

### a. Judicial Review under the APA

Plaintiffs assert jurisdiction under 28 U.S.C. § 1331, the

Federal question statute, the Fifth Amendment of the
Constitution, the Stafford Act, CERCLA and the APA.  (Pls.' Mem.
Law at 5.)

The federal question statute, 28 U.S.C. § 1331, in
combination with the APA, 5 U.S.C. § 702, provides for judicial
review of Federal administrative actions.  <u>Califano v. Sanders</u>,
430 U.S. 99, 105-07 (1977); <u>Lunney v. United States</u>, 319 F.3d
550, 557-58 (2d Cir. 2003); <u>New York v. U.S. E.P.A.</u>, 350 F. Supp.
2d 429 (S.D.N.Y. 2004).  The APA provides that "a person
suffering legal wrong because of agency action or adversely
affected or aggrieved by agency action within the meaning of a
relevant statute, is entitled to judicial review thereof."  5
U.S.C. § 702.  This provision waives sovereign immunity in
actions for relief other than money damages against officials
acting in their official capacity, concerning "[a]gency action
made reviewable by statute and final agency action for which
there is no other adequate remedy in a court.  5 U.S.C. § 704.

The APA's waiver of sovereign immunity, however, is not
unlimited.  Judicial review of agency action under the APA is
unavailable where "(1) statutes preclude judicial review; or (2)
agency action is committed to agency discretion by law."  5
U.S.C. § 701(a).  The former restriction applies to instances
where Congress expressed an intent to prohibit judicial review;

the latter restriction applies where statutes are drawn in such broad terms that there is no law to apply in any given case.  <u>See</u> <u>Webster v. Doe</u>, 486 U.S. 592, 599 (1988) (citing <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 410 (1971)).

### b.  Preclusion under § 701(a)(1) of the APA

The exceptions to judicial review under the APA contained in 5 U.S.C. § 701 must be construed in light of the "strong presumption that Congress intends judicial review of administrative actions."  <u>Traynor v. Turnage</u>, 485 U.S. 535, 542 (1988).  Judicial review may be overcome "only upon a showing of 'clear and convincing evidence' of contrary legislative intent." <u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136, 140-41 (1967), <u>overruled on other grounds by</u> <u>Califano v. Sanders</u>, 430 U.S. 99 (1977).  An indicator of such intent can be found in the specific language of the statute or specific legislative history.  <u>See</u> <u>Block v. Community Nutrition Institute</u>, 467 U.S. 340, 349 (1984). Moreover, "The fact that a statute precludes review of a particular category of determinations does not mean that Congress intended to preclude review of other types of determinations covered by the same statute."  <u>State of New York v. United States Environmental Protection Agency</u>, 350 F. Supp. 2d 429, 437 (S.D.N.Y. 2004) (citing <u>Bowen v. Michigan Academy of Family</u>

Physicians, 476 U.S. 667, 674, 680-81 (1986)).

In determining whether and to what extent a particular statute precludes judicial review, a court may look at the express language of the statute, the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved. See Block, 467 U.S. at 345 (1984). Unconstitutional agency action, however, is never precluded from judicial review. "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear . . . . [This is required] in part to avoid the serious constitutional question that would arise if a Federal statute were construed to deny any judicial forum for a colorable constitutional claim." Webster v. Doe, 486 U.S. 592, 603 (1988) (internal quotations and citations omitted). See also Johnson v. Robinson, 415 U.S. 361, 373-74 (1974) (same); Battaglia v. Gen. Motors Corp, 169 F.2d 254, 257 (2d Cir. 1948) (finding that although Congress has the power to give, withhold and restrict the jurisdiction of courts other than the Supreme Court, "it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law . . . .").


c.  Stafford Act

Section 5148 of the Stafford Act provides that

59

> The Federal Government shall not be liable for
> any claim based upon the exercise or performance
> of or the failure to exercise or perform a
> discretionary function or duty on the part of a
> Federal agency or an employee of the Federal
> Government in carrying out the provisions of
> this chapter.

42 U.S.C. § 5148.  The legislative history of § 5148 reflects

Congress' intent to provide broad immunity for discretionary

actions taken by officials under the Act.  Prior to its passage,

Representative Whittington, Chairman of the House Public Works

Committee, stated:

> We have further provided that if the agencies
> of the Government make a mistake in the admini-
> stration of the Disaster Relief Act that the
> Government may not be sued.  Strange as it may
> seem, there are many suits pending in the Court
> of Claims today against the Government because
> of alleged mistakes made in the administration
> of other relief acts, suits aggregating millions
> of dollars because citizens averred that the
> agencies and employees of Government made mistakes.
> We have put a stipulation in here that there shall
> be no liability on the part of the Government.

H.R. 8396, 81st Cong., 2d Sess., 96 Cong.Rec. 11895, 11912 (1950).

The language of the statute and the legislative history of

the Stafford Act clearly preclude discretionary actions taken

under the Stafford Act from judicial review.  The question then

becomes whether the actions taken by the EPA are discretionary or

mandatory functions.[21]


(1)  Discretionary Functions Exception

In determining whether the actions taken by the EPA are discretionary functions shielded from judicial review by the Stafford Act, courts have looked to the two-prong test set forth by the Supreme Court in United States v. Gaubert, 499 U.S. 315

_____

[21]  Plaintiffs argue that § 5148 of the Stafford Act does not apply because CERCLA waiver of sovereign immunity trumps the preclusion of judicial review contained in § 5148.  To support their argument, Plaintiffs cite United States v. City of New Orleans, No. Civ.A. 02-3618, 2003 WL 22208578 (E.D. La. Sept. 19, 2003).  In City of New Orleans, the district court found that

> the express language of the statute superimposes
> CERCLA liability on agencies of the government
> even in the event that those agencies, including
> the [U.S. Army Corps of Engineers ("Corps")], would
> not be liable generally for damages from their
> actions pursuant to waivers for liability in other
> statutes.  For example, pursuant to § 5148 of the
> [Stafford Act], the Corps may not be liable to an
> individual whose property is damaged, or who is
> personally injured, by the Corps' actions in its
> clean-up of hurricane debris, but that waiver of
> liability does not extend to Corps' activities
> that fall within the ambit of CERCLA § 9607(a) as
> alleged in CFI's counterclaim.

2003 WL 22208578, at *13.

Plaintiffs are bringing an APA claim against EPA Defendants, and not a claim under § 9607(a) of CERCLA, as did the Plaintiffs in City of New Orleans.  Therefore, the reasoning applied by the court in City of New Orleans when it found that CERCLA waiver of sovereign immunity trumped § 5148 has no applicability to Plaintiffs' second cause of action.

(1991), which dealt with when the discretionary function exception under the Federal Tort Claims Act applied.[22]  See Dureiko v. United States, 209 F.3d 1345, 1351 (Fed. Cir. 2000); Sunrise Village Mobile Home Park, L.C. v. United States, 42 Fed. Cl. 392, 398 (Ct. Cl. 1998); California-Nevada Methodist Homes, Inc. v. Federal Emergency Management Agency, 152 F. Supp. 2d 1202, 1207 (N.D. Cal. 2001); United Power Association v. Federal Emergency Management Agency., No. A2 99-180, 2000 WL 33339635 (D.N.D. Sept. 13, 2000).

The court must determine first, whether the act involves an element of judgment or choice, and if so, then whether that judgment is of the kind that the discretionary function exception was designed to shield.  See United States v. Gaubert, 499 U.S. 315, 322 (1991); Berkovitz v. United States, 486 U.S. 531, 536 (1988).  "Under the first prong, an act does not involve an

---

[22]  The Federal Tort Claims Act ("FTCA") contains a provision which exempts the government from liability for

Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

element or choice if it is mandatory, i.e., if a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow."  Dureiko, 209 F.3d at 1351 (internal quotations omitted).  "Under the second prong, because the discretionary function exception serves to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, the exception protects only governmental actions and decisions based on considerations of public policy."  Id. (internal citations and quotations omitted).

Plaintiffs allege the EPA violated six regulatory provisions contained in the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), enacted pursuant to CERCLA, and which are effective upon declaration of a national disaster pursuant to the Stafford Act.

### (a)  40 C.F.R. § 300.15

40 C.F.R. § 300.155 provides that "When an incident occurs, it is imperative to give the public prompt, accurate information on the nature of the incident and the actions underway to mitigate the damage."

Plaintiffs claim that this provision commands that the public be told the truth, and that the word "imperative"

unquestionably describes a mandatory duty.  (Pls.' Mem. Law at 12.)  EPA Defendants argues that although § 300.155 states the "general point that prompt accurate information is 'imperative,' . . . the specific language following that general point does not impose requirements."  (EPA Defs.' Mem. Law at 7.)

Although § 300.155(a) states that it is "imperative" that the public be told the truth, the provision does not elaborate on this duty, and instead, lists discretionary duties of the On-Scene Coordinators/Remedial Project Managers: that they "should ensure that all appropriate public and private interests are kept informed" and that they "should coordinate with available public affairs/community relations resources to carry out this responsibility."  40 C.F.R. § 300.155(a) (emphasis added).  The provision does not contain any language that makes informing the public of the truth a mandatory duty.`

### (b)   40 C.F.R. § 300.170

40 C.F.R. § 300.170 provides that Federal agencies have duties established by statute, executive order or Presidential directive, which may apply to Federal response actions following, or in prevention of, the discharge of oil or release of a hazardous substance, pollutant or contaminant.  Plaintiffs allege that the EPA failed to follow Federal authority, including the

Presidential Decision Directive 62, which they allege, mandates that the EPA take lead responsibility over ensuring that WTC dust was removed from all interior spaces. (Pls.' Mem. Law at 12-13.)

As EPA Defendants assert, the provision does not itself establish any duties.  It merely states that Presidential Directives and other statutes and executive orders may apply.

### (c)  40 C.F.R. § 35.6205

40 C.F.R. § 35.6205 provides that "[i]f both the State and EPA agree, a political subdivision with the necessary capabilities and jurisdictional authority may assume the lead responsibility for all, or a portion, of the removal activity at a site."  Plaintiffs claim that the EPA "violated its non-discretionary duty to take the lead in removing contaminated interior WTC dust" when it was obvious that New York City lacked capability and when the City explicitly told the EPA that it intended to simply pass on responsibility for removal to the public.  (Pls.' Mem. Law at 13.)

The phrase "necessary capabilities" does not provide a specific prescribed course of action, and instead, appears to leave to the agency's discretion to determine whether a political subdivision, such as New York City, has the necessary capabilities to assume responsibility for removal activity.

### (d) 40 C.F.R. § 300.3(d)

40 C.F.R. § 300.3(d) provides that "the NCP applies to and is in effect when the Federal Response Plan and some or all its Emergency Support Functions (ESFs) are activated." Plaintiffs, relying on statements made by Kathleen Callahan, Director of the EPA Region 2's Division of Environmental Planning and Protection, argue that the EPA did not act pursuant to the NCP in its post-September 11, 2001 clean-up efforts.

However, again, as EPA Defendants point out, § 300.3(d) does not by itself create any nondiscretionary duty. It merely states that the NCP is in effect when an Emergency Support Function is activated.

### (e) 40 C.F.R. §§ 300.400(g)(4), 300.5 and 763.92

40 C.F.R. § 300.400(g)(4) provides that only those state standards that are promulgated and more stringent than Federal requirements "may be applicable or relevant and appropriate." 40 C.F.R. § 300.5 provides a list of definitions. 40 C.F.R. § 763.92 lists duties of "local education agencies" defined as "the owner of any nonpublic, nonprofit elementary, or secondary school building," or "the governing authority of any school operated under the defense dependents' education system provided for under

the Defense Dependants' Education Act of 1978)."  40 C.F.R. §
763.83.

Plaintiffs claim that the EPA violated § 300.400(g)(4) as
well as 40 C.F.R. § 300.5 by endorsing the City's "unsafe 'do it
yourself' clean up guidelines."  (Pls.' Mem. Law at 13.)

Section 300.400(g)(4) merely states that those state
standards that are promulgated, which is defined as standards "of
general applicability and are legally enforceable," that are
identified and are more stringent than Federal requirements <u>may</u>
be applicable.  The Court cannot see how this imposes any kind of
mandatory duty.  Nor does the Court see how §§ 300.5 or 763.92
are applicable to this case.

### (f) 40 C.F.R. § 300.415(b)(2)

40 C.F.R. § 300.415(b)(2), which pertains to removal
actions, provides that several factors "shall be considered in
determining the appropriateness of a removal action pursuant to
this section," including "actual or potential exposure to nearby
human populations, animals, or the food chain from hazardous
substances or pollutants or contaminants."  40 C.F.R. §
300.415(b)(2)(I).  Plaintiffs state that this provision clearly
establishes a mandatory duty on the part of the EPA to consider
the factors set forth in the provision.

Again, as EPA Defendants correctly point out, 40 C.F.R. §
300.400(I) provides that "Activities by the federal and state
government in implementing this subpart are discretionary
government functions . . . . This subpart does not create any
duty of the federal government to take any response action at any
particular time."  40 C.F.R. § 300.415(b)(2) is in that subpart,
Subpart E.

Accordingly, the Court finds that the regulations asserted
by Plaintiffs as the basis for their APA claim are discretionary
in nature and therefore, are precluded from judicial review by §
5148 of the Stafford Act.


### (2) Constitutional Claims

Although § 5148 precludes judicial review of discretionary
actions, as mentioned previously, "[it] does not deprive the
federal courts of jurisdiction of . . . constitutional claims."
Rosas v. Brock, 826 F.2d 1004, 1008 (11th Cir. 1987); see also
United Powers Ass'n v. Federal Emergency Management Agency, No.
A2-99-180, 2001 WL 1789404, at *2 (D.N.D. Aug. 14, 2001) (finding
that § 5148 does not preclude review of plaintiff's
constitutional claim to the application of an agency rule);
Lockett v. Federal Emergency Management Agency, 836 F. Supp. 847
(S.D. Fla. 1993) (finding that court had jurisdiction over claims

alleging constitutional violations of agency pursuant to actions taken under the Stafford Act).  As stated previously, the Supreme Court has recognized that a colorable constitutional claim will not be denied by a statutory provision which precludes judicial review but which does not specifically preclude judicial review of constitutional claims.  See <u>Webster v. Doe</u>, 486 U.S. 592, 603. A "colorable constitutional claim" has been described as "any claim other than one that 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction' or one that is 'wholly insubstantial and frivolous.'"  <u>Chesna v. United States Dep't of Defense</u>, 822 F. Supp. 90, 97 (D. Conn. 1993) (quoting <u>Bell v. Hood</u>, 327 U.S. 678, 682-83 (1946), and citing <u>Spencer v. Casavilla</u>, 903 F.2d 171, 173 (2d Cir. 1990)).

Defendants argue that for the same reason that Individual Defendants' Motion to Dismiss should be granted, EPA Defendants' Motion to Dismiss the APA Claim must also be granted.

Plaintiffs have alleged that EPA Defendants violated their substantive due process right under the Fifth Amendment of the Constitution.  Plaintiffs argue, as they did in the first cause of action, that the EPA violated their constitutional right "to be free of official policies that create or intensify the risk of bodily harm."  (Pls.' Mem. Law at 8.).  Specifically, in Count Two, Plaintiffs contend that EPA Defendants issued false

statements to Plaintiffs and the putative class, delegated all responsibility for interior clean-up to the City of New York, failed to supervise and oversee the clean-up efforts by the City, referring to the public guidelines issued by the City which were grossly inadequate, failed to properly assess the proper geographical scope of the hazard, failed to properly assess the hazardous substances in the WTC dust, and failed to properly remediate through their voluntary clean-up program.  (Am. Compl. ¶ 236.)  By these actions, EPA Defendants created or enhanced the danger to Plaintiffs.

As courts have made clear, a governmental agency cannot, even in following discretionary regulations, choose to flout a person's constitutional rights.  Hence, although the Court has found that the regulations cited by Plaintiffs pose discretionary and not mandatory duties, Plaintiffs have made the additional argument that EPA Defendants violated their constitutional rights in their interpretation and implementation of the applicable regulations.   Plaintiffs' constitutional claim is not "wholly insubstantial and frivolous."  Accordingly, the Court has jurisdiction over Plaintiffs' claim under the APA for violation of their substantive due process rights.[23]

_____

[23]   As an alternative jurisdictional basis for their APA Claim, Plaintiffs argue that the EPA did not follow the NCP, as

### c. "Agency Action" under the APA

EPA Defendants argue that dismissal of the APA claim is also warranted because Plaintiffs' Amended Complaint fails to identify "agency actions" that are challengeable under the APA. In response, Plaintiffs argue that they have clearly identified the EPA's "final agency action" in this case: "the now-completed voluntary clean-up program -- a removal action taken by the EPA pursuant to the NCP, 40 C.F.R. § 300.415." (Pls.' Mem. Law at 17.)

EPA Defendants further argue that Plaintiffs cannot maintain a claim challenging the EPA's removal action as an APA action because such a claim is barred by CERCLA's judicial review provision in 42 U.S.C. § 9613(h)." (EPA Defs.' Reply at 9.) However, EPA Defendants fail to take into account the limits of 42 U.S.C. § 9613(h). This bar of judicial review is broad in

---

they were instructed to do under 40 C.F.R. § 300.3(d). This argument is separate and apart from the issue of whether this regulation imposes a mandatory or discretionary duty.

An agency must follow its own regulations and may be sued for failure to do so. Service v. Dulles, 354 U.S. 363, 371-73 (1967) (stating that although statute granted agency "absolute discretion" regarding employee discharge decisions, agency must still comply with its own regulations, and court has jurisdiction to consider claims that it did not do so). Hence, the Court also has jurisdiction of the APA claim because Plaintiffs claim that the EPA did not follow its own regulations under the NCP.

scope, even barring, as EPA Defendants state, constitutional challenges to removal and remedial actions selected under 42 U.S.C. § 9604.[24]  See J.V. Peters & Co. v. Administrator, EPA, 767 F.2d 263, 265 (6th Cir. 1986) (holding that constitutional challenges could not be brought prior to government enforcement or cost recovery action, as allowing a pre-emptive challenge to the EPA clean-up action would "debilitate the central function of the Act," which is the prompt clean-up of environmentally hazardous waste sites.); see also Broward Gardens Tenants Ass'n v. EPA, 311 F.3d 1066, 1074 (11th Cir. 2002); Reardon v. United States, 947 F.2d 1509, 1514-15 (1st Cir. 1991); Clinton County Comm'rs v. EPA, 116 F.3d 1018, 1025-26 (3d Cir. 1997).

However, as the heading of § 9613(h) indicates, "Timing of review," this provision is concerned with the timing of judicial review of removal and remedial actions.  "The purpose of this limitation [contained in § 9613(h)] on federal court jurisdiction over challenges to EPA activities under CERCLA is to prevent litigation that will delay the EPA's cleanup efforts."  Juniper Development Group v. United States of America, 774 F. Supp. 56,

---

[24]  Plaintiffs do not specifically state that this removal action falls under 42 U.S.C. § 9604.  However, a review of the regulation, 40 C.F.R. § 300.415 and 42 U.S.C. § 9604 makes it apparent that a removal action under 40 C.F.R. § 300.415 is a removal action under 42 U.S.C. § 9604.

58 (D. Mass. 1990). The legislative history of § 9613(h) also indicates that § 9613(h) was enacted to ensure that clean-up efforts would not be delayed:

> [T]he timing of review section ensures that Government and private cleanup resources will be directed toward mitigation, not litigation. The section is designed to preclude piecemeal review and excessive delay of cleanup. Interested parties will be able to participate early in a more regularized administrative process instead of making premature challenges in court to remedy selection or liability.

Legislative History, Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613, <u>et seq.</u> (1986).

The voluntary clean-up program cited by Plaintiffs as the agency action in question is completed. Therefore, the bar on judicial review contained in § 9613(h) does not apply.

As mentioned previously, § 702 provides judicial review for "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ." 5 U.S.C. § 702. "Agency action" is defined under the statute as "the whole or part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). Section 706 further limits judicial review under the APA by

requiring "agency action."[25]

Several factors must be considered in assessing the finality of an agency action:  (1) whether the action represents the agency's final and definitive position; (2) whether the action has a "practical and immediate" effect on the plaintiff; (3) whether the dispute involves questions that are purely legal or are otherwise fit for judicial review; and (4) whether immediate review would foster agency and judicial economy.  See FTC v.

---

[25]  Section 706 provides in pertinent part that:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall --

(1)  compel agency action unlawfully withheld or unreasonably delayed; and

(2)  hold unlawful and set aside agency action, findings and conclusions found to be --

(A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)  contrary to constitutional right, power, privilege, or immunity;

(C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)  without observance of procedure required by law; . . . .

5 U.S.C. § 706.

Standard Oil Co., 449 U.S. 232, 239–42 (1980).

Upon consideration of the appropriate factors, the Court finds that "the now-completed voluntary clean-up program" is a final agency action subject to judicial review under the APA. According to the Amended Complaint, the voluntary clean-up program represents the final and definitive position of the EPA and has had a "practical and immediate" effect on Plaintiffs. Moreover, Plaintiffs' claim raises constitutional questions that are obviously fit for review, and nothing has been put forward by Defendants to indicate that immediate review would not foster agency and judicial economy.

Accordingly, as the Court has found that it has jurisdiction over Plaintiffs' claim, and that Plaintiffs have identified a final agency action by the EPA, EPA Defendants' Motion to Dismiss the APA Claim is DENIED.


3.    Third Cause of Action: Mandamus Claim

Defendants argue that Count Three must be dismissed for lack of subject matter jurisdiction because Plaintiffs have not alleged a waiver of sovereign immunity in either their APA or CERCLA claims.  Alternatively, Defendants contend that the mandamus action fails as a matter of law for not complying with requirements of a mandamus claim.

Section 1361 of Title 28, United States Code, provides that "the district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." "The extraordinary remedy of mandamus will issue only to compel the performance of 'a clear nondiscretionary duty.'" Pittston Coal Group v. Sebben, 488 U.S. 105, 121 (1988) (citing Heckler v. Ringer, 466 U.S. 602, 616 (1984)). A plaintiff seeking this remedy must allege three elements: (1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy. Billiteri v. United States Bd. of Parole, 541 F.2d 938, 946 (2d Cir. 1976); Lovallo v. Froehlke, 468 F.2d 340, 343 (2d Cir. 1972).

The Court has upheld Plaintiffs' APA claim, and as Plaintiffs have recognized, if either the APA or CERCLA claim is upheld "then this mandamus claim may be unnecessary." (Pls.' Mem. Law at 23, n.28.) Plaintiffs seek identical relief in their APA and mandamus claims. (Am. Compl. ¶¶ 232, 239.) The APA claim alone provides an adequate remedy for Plaintiffs. Accordingly, the mandamus claim is DISMISSED.

**4.  Fourth Cause of Action: CERCLA Citizen Suit Claim**

The EPA argues that dismissal of the CERCLA Citizen Suit Claim is required because Plaintiffs' allegation that EPA actions were "arbitrary and capricious" is not a proper citizen suit claim under 42 U.S.C. § 9659(a)(1), which is limited to allegations that a defendant is "in violation of" the statute, and that Plaintiffs have failed to state a claim within the scope of the citizen suit provision in 42 U.S.C. § 9659(a)(1). According to the EPA, 42 U.S.C. § 9659(a)(1) is the provision by which persons may enforce violations of CERCLA against regulated parties.  (EPA Defs.' Mem. Law at 22.)  The EPA, Defendants argue, are not regulated parties under CERCLA but the administrator of CERCLA.  Hence, any challenges based on the EPA's implementation of CERCLA must be brought under 42 U.S.C. § 9659(a)(2).  Plaintiffs disagree; Plaintiffs maintain that § 9659(a)(1) is the proper cause of action because they are alleging violations by the EPA as a regulated party, and not as implementor of CERCLA.

CERCLA was enacted to address "environmental and health risks posed by industrial pollution."  United States v. Bestfoods, 524 U.S. 51, 55 (1998).  The statute grants the President, and the Administrator of the EPA as the President's delegated agent, "broad power to command government agencies and

77

private parties to clean up hazardous wastes" by or at the expense of the parties responsible for the contamination. <u>Key Tronic Corp. v. United States</u>, 511 U.S. 809, 814 (1994). It serves to "protect and preserve public health and the environment by facilitating the expeditious and efficient cleanup of hazardous waste sites." <u>Pritkin v. Department of Energy</u>, 254 F.3d 791, 794-95 (9th Cir. 2001) (internal quotations and citations omitted). The procedure established in CERCLA facilitates hazardous waste site clean-ups and insures that whoever undertakes the responsibility of clean-up can recover those costs from potentially responsible parties ("PRPs"). <u>See</u> 42 U.S.C. §§ 9604, 9606, 9607 and 9620. Two major policy concerns underlie CERCLA: (1) Congress intended that the Federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal; and (2) Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created. <u>Dedham Water Co. v. Cumberland Farms Dairy, Inc.</u>, 805 F.2d 1074, 1081 (1st Cir. 1986); <u>United States v. Cannons Engineering Corp.</u>, 899 F.2d 79, 90-91 (1st Cir. 1990); <u>see also</u> <u>United States v. Davis</u>, 261 F.3d 1, 26 (1st Cir. 2001) ("The purposes of CERCLA include

expeditious remediation at waste sites, adequate compensation to the public fisc and the imposition of accountability."); AmJur Pollution § 1270 ("[CERCLA's] primary purposes are to provide for the prompt cleanup of hazardous waste disposal sites and to impose the costs of such cleanup on those responsible for the contamination.").

CERCLA's citizen suit provision, contained in 42 U.S.C. § 9649, permits citizens to sue as private attorneys general in circumstances where government authorities have, after given notice, failed to take steps to remedy certain environmental harms.  Section 9659 provides that:

> (a) Authority to bring civil actions
> Except as provided in subsections (d) and (e) of this section and in section 9613(h) of this title (relating to timing of judicial review), any person may commence a civil action on his own behalf –
>
> > (1) against any person (including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any standard, regulation, condition, requirement or order which has become effective pursuant to this chapter . . . ; or
> >
> > (2) against the President or any other officer of the United States (including the Administrator of the Environmental Protection Agency and the Administrator of ATSDR) where there is alleged a failure of the President or of such other officer to perform any act or duty under this chapter, including an act or duty under section 9620 of this title (relating to Federal

>          facilities), which is not discretionary with
>          the President or such other officer.

42 U.S.C. § 9659(a).  The provision restricts venue for actions

under subsection (a)(2) to the United States District Court for

the District of Columbia.  See 42 U.S.C. § 9659(b).

    A similar citizen suit provision is found in the Endangered

Species Act ("ESA").  In Bennett v. Spears, 520 U.S. 154 (1997),

the Supreme Court found that the citizen suit provision in the

Endangered Species Act, authorizing injunctive actions against

any person "who is alleged to be in violation" of the ESA, could

not be interpreted to include the Secretary's maladministration

of the ESA.  520 U.S. at 173.  The Supreme Court came to this

conclusion after examining the statute as a whole, and also in

view of a separate citizen suit provision in the ESA which

authorized suit against the Secretary to compel him to perform a

nondiscretionary duty.  The Supreme Court stated that "That

provision would be superfluous -- and worse still, its careful

limitation to § 1533 would be nullified -- if § 1540(g)(1)(A)

permitted suit against the Secretary for any 'violation' of the

ESA."  Id.

    A district court in Illinois applied the Supreme Court's

reasoning in Bennett to find that "citizens suit" provision in

the Endangered Species Act was "analogous to that of CERCLA, [and

80

that] the term violation in 42 U.S.C. § 9659(a)(1) does not include the Administration's maladministration of (CERCLA) . . . ." <u>Battaglia v. Browner</u>, 963 F. Supp. 689, 691 (N.D. Ill. 1997).

Plaintiffs argue that § 9659(a)(1) is the appropriate citizen suit provision because the EPA as an agency violated the NCP in many respects and because the EPA as an agency is the named defendant in the CERCLA cause of action, and not just the Administrator of the EPA. Plaintiffs argue that in <u>Bennett</u>, and two other cases cited by EPA Defendants, only the EPA's role as Administrator was at issue; the EPA itself is not the regulated party. (Pls.' Mem. Law at 25.) Neither of the two cases cited by Plaintiffs, <u>United States v. Hardage</u>, 982 F.2d 1436 (10th Cir. 1992) and <u>Washington State Dep't of Transp. v. Washington Natural Gas Co.</u>, 59 F.3d 793 (9th Cir. 1995), concern citizen suits under CERCLA. Plaintiffs make no other argument or present any other caselaw that would support their contention that the EPA is a regulated party in this factual context.

The Court is entirely unpersuaded by Plaintiffs' arguments. Plaintiffs have argued elsewhere that their claim under the APA should be upheld because EPA Defendants violated nondiscretionary duties under the NCP. Based on the same types of violations, they seek to bring a citizen suit against the EPA under § 9659(a)(1), effectively attempting to end-run the statute and

avoid bringing the suit under § 9659(a)(2) by naming the EPA as defendant and not the Administrator of the EPA.

It is clear to the Court that Plaintiffs' allegations against the EPA are for its failures to carry out its duties under CERLCA as administrator of CERCLA, and not as a regulated party. The EPA, as administrator of CERCLA, does not regulate itself. The appropriate citizen suit provision for the types of allegations made by Plaintiff here is § 9659(a)(2), which limits venue to the District of Columbia.

Accordingly, EPA Defendants' Motion to Dismiss Count Four is GRANTED.


### III. CONCLUSION

For the foregoing reasons, Individual Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. EPA Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Count One against Defendant Horinko and Counts Three and Four are DISMISSED.

Defendant Whitman and EPA Defendants shall file an Answer to Counts One and Two of the Amended Complaint within forty-five (45) days of the date of this Order.

SO ORDERED.

Dated:   New York, New York
February 2 , 2006

DEBORAH A. BATTS
United States District Judge